IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| ADRIANNA R HABER, | ) | CASE NO. 4:21-CV-1038 |
| | ) | |
| Plaintiff, | ) | JUDGE JOHN R. ADAMS |
| | ) | |
| vs. | ) | |
| | ) | MAGISTRATE JUDGE |
| | ) | JONATHAN D. GREENBERG |
| | ) | |
| COMMISSIONER OF SOCIAL | ) | |
| SECURITY, | ) | **REPORT & RECOMMENDATION** |
| Defendant. | ) | |

Plaintiff, Adrianna Haber ("Plaintiff" or "Haber"), challenges the final decision of Defendant, Kilolo Kijakazi,[1] Commissioner of Social Security ("Commissioner"), denying her applications for Child's Insurance Benefits ("CIB") and Supplemental Security Income ("SSI") under Titles II and XVI of the Social Security Act, 42 U.S.C. §§ 416(i), 423, 1381 *et seq*. ("Act").  This Court has jurisdiction pursuant to 42 U.S.C. § 405(g).  This case is before the undersigned United States Magistrate Judge pursuant to an automatic referral under Local Rule 72.2(b) for a Report and Recommendation.  For the reasons set forth below, the Magistrate Judge recommends that the Commissioner's final decision be VACATED and REMANDED for further proceedings consistent with this opinion.

## I. PROCEDURAL HISTORY

On August 31, 2017, Haber filed applications for CIB and SSI, alleging a disability onset date of December 16, 1996 and claiming she was disabled due to anxiety, depression, and sensory integration.  Transcript ("Tr.") at 311, 318, 335.  The applications were denied initially and upon reconsideration, and Haber requested a hearing before an administrative law judge ("ALJ").  Tr. 205.

---

[1] On July 9, 2021, Kilolo Kijakazi became the Acting Commissioner of Social Security.

On May 3, 2019, an ALJ held a hearing, during which Haber, represented by counsel, and an impartial vocational expert ("VE") testified.  Tr. 75-102.  On June 27, 2019, the ALJ issued an unfavorable decision (Tr. 157-173) and the Appeals Council remanded because the ALJ had not considered Haber's CIB claim (Tr. 179-182).  On September 16, 2020, the ALJ held a second hearing (Tr. 42-74) and, on October 9, 2020, issued a written decision finding that Haber was not disabled and denying both of her applications.  Tr. 15-34.  The ALJ's decision became final on March 26, 2021, when the Appeals Council declined further review.  Tr. 1-3.

On May 18, 2021, Haber filed her Complaint to challenge the Commissioner's final decision.  Doc. No. 1.  The parties have completed briefing in this case.  Doc. Nos. 10, 13, 14.  Haber asserts the following assignments of error:

> (1)  The appointment of Andrew Saul as Commissioner of the Social Security Administration violated the separation of powers. As such, the decision in this case by an ALJ who derived his authority from Andrew Saul was constitutionally defective.

> (2)  The ALJ's RFC was not supported by substantial evidence as he failed to properly evaluate the evidence documenting the combination of Haber'[s] severe impairments and the fact that the evidence supported that the combination of her impairments precluded her from engaging in substantial gainful activity on a sustained and full-time basis.

> (3) The ALJ erred in his determination regarding the persuasiveness of Haber's treating sources and his evaluation of Haber's symptoms was in violation of Social Security Ruling 16-3p.

Doc. No. 10, p. 1.

## II. EVIDENCE

### A.    Personal and Vocational Evidence

Haber was born in 1996 and turned 18 in 2014.  Tr. 33.  She has at least a high school education. Tr. 33.

**B.**     **Relevant Medical Evidence[2]**

Haber was in mental health treatment from age four to about ten or eleven with Elizabeth Finley-Belgrad, M.D.  Tr. 524, 525.  She had had an IEP plan in school since about the 1st or 2nd grade.  Tr. 524.  In January 2014, when Haber was a junior in high school, her father met with Dr. Finley-Belgrad and indicated that he thought his daughter was experiencing depressive symptoms.  Tr. 524.  Dr. Finley-Belgrad diagnosed Haber with major depressive disorder "quite likely, though also mood disorder related to underlying sensory processing issues."  Tr. 525.

In 2014, Haber's IEP plan included the following accommodations: extended time for tests, tests in the resource lab, extended time for class work, preferential seating, copy of teacher notes, teacher to cue or remind her regarding assignments, word bank for tests, review of notes prior to and at midpoint during tests, use of books/notes during tests as determined by the interventionist, directions read and clarified, oral testing if needed, and use of calculator.  Tr. 431.  It was noted that her disability adversely affected her performance in school and she had a deficit in math; her cognitive abilities fell within the average/above average range.  Tr. 431, 432.  She was described as "a very intelligent, creative young lady who excels in art and writing" and was active in several clubs.  Tr. 432.  She had good self-help skills, good relationships, took pride in her work, respected the property of others, and used appropriate language and manners.  Tr. 433.  She needed to improve being prompt and on time, completing all homework on time, turning all homework in on time, using self-check methods to identify and correct errors, and asking for missed work when absent.  Tr. 433.

---

[2] The Court's recitation of the medical evidence is not intended to be exhaustive and is limited to the evidence cited in the parties' Briefs.  The undersigned's Initial Order states, "**All facts relevant to the legal issues and discussion must be set forth in the 'Facts' section**."  Doc. No. 4, p. 3 (emphasis in original).  Here, Haber did not set forth all the facts relevant to her argument in the "Facts" section of her brief.  Rather, the argument section of her brief contains swaths of factual evidence that she did not detail in the "Facts" section.  See, e.g., Doc. No. 10, p. 3 (stating that Dr. Hunt completed a medical statement and off-task assessment with no details in the "Facts" section of the brief); pp. 21-22 (detailing all of Dr. Hunt's findings in his opinion in the "Argument" section of the brief).  Counsel should take care to comply with Court Orders when presenting her case; her failure to do so may result in a court striking portions of her brief that are non-compliant.

In April 2014, Haber was evaluated by the school psychologist.  Tr. 463.  Her scores did not indicate "significant clinical areas at this time," but she had at-risk scores in the following areas: locus of control, social stress, emotional symptoms, relations with parents, and self-reliance.  Tr. 462.  She felt that she was blamed for things outside her control, that her parents had too much control over her day-to-day life, her friends had more fun than she did, and she felt lonely and left out.  Tr. 462.

In April 2015, Haber's IEP continued her accommodations.  Tr. 421.

In May 2015, Haber was cited as refusing mental health treatment and medications.  Tr. 506.

In June 2015, upon graduation, Haber had "mastered her math goals and objectives."  Tr. 426

In January 2016, Haber's parents saw Dr. Finley-Belgrad without her, seeking advice; Haber had dropped out of college and had moved home after living in a dorm.  Tr. 531.  They reported severe depressive symptoms.  Tr. 531.  Dr. Finley-Belgrad wrote that it was "reasonable to consider SSI as she is really not functioning well at all at this time."  Tr. 530.

 In April 2016, Haber saw Dr. Finley-Belgrad.  Tr. 532.  She appeared casually dressed and had normal motor activity; she was alert and gave relevant responses to questions; her speech, thought process, and mood were all normal; her affect was stable and her judgment and insight were good.  Tr. 532.  She described her self-esteem as average and endorsed 5-6 months of depressive symptoms.  Tr. 532-533.  She reported anxiety when someone comes over and sleep, organization, and hygiene issues.  Tr. 533.  She was diagnosed with major depression and prescribed magnesium gluconate.  Tr. 533.  Her exam findings remained the same during visits in May and June 2016.  Tr. 534, 537.

In June 2016, Haber began counselling with licensed social worker Susan Malkoff.  Tr. 514.  She described conflicts with her parents, including their overprotectiveness.  Tr. 514, 516.  She saw Dr. Finley-Belgrad in July and August and her mental status exams were unremarkable.  Tr. 539, 541.  In August she reported improved sleep (Tr. 515) and told Dr. Finley-Belgrad that her weekly counseling

sessions were helpful (Tr. 516). Dr. Finley-Belgrad diagnosed mild major depression. Tr. 516.

In September 2016 Haber told Malkoff that she was going to try an internship for a month in Columbus with her father's friend, studying art and writing. Tr. 516. During that month, she had telephone sessions with Malkoff and she sounded "very positive." Tr. 518.

Haber next saw Malkoff in April 2017 and outlined two goals: "ideal body" and moving out of the house and getting back into society and learning to be around people in her age group. Tr. 519. She reported trouble focusing when she was in school from sensory integration problems (sensitive to the way clothes feel against her body). Tr. 519, 513. In May she was looking at the classified ads for jobs and Malkoff recommended seeing Dr. Finley-Belgrad. Tr. 519.

In June 2017, Haber visited a medical provider; upon exam, she had a normal mood and appropriate affect. Tr. 493. She saw Dr. Finley-Belgrad and reported that she had initially felt "notably happier" on Prozac for her depressive symptoms but it was not so notable now. Tr. 549-550. Her mental status exam findings were normal. Tr. 550. Her Prozac dose was increased. Tr. 550.

On August 11, 2017, Haber saw Dr. Finley-Belgrad and reported she that her Prozac was helping. Tr. 553. She had not been to see her counselor in a while and Dr. Finley-Belgrad talked about the importance of regular counseling. Tr. 553. On August 21, Haber saw Malkoff and reported feeling better on her medication: more level, less anxious, and able to remember things better. Tr. 520. She reported ongoing conflicts with her parents. Tr. 520.

In September 2017, Haber reported increased stress to Dr. Finley-Belgrad after a family trip to Georgia and her mother's increasing mental health problems. Tr. 554-555. Upon exam, she had normal mental status findings. Tr. 554. With Prozac she felt more energetic and seemed "much happier"; Dr. Finley-Belgrad wrote, "seems to be having an excellent effect from Prozac." Tr. 555.

On October 2, 2017, Haber saw Malkoff and shared that she had overheard her parents say that if

she obtained disability they wanted her to move out; she confronted them and they said they would not make her move out.  Tr. 521.  She also described other significant family conflicts.  Tr. 521.  The same day Malkoff completed a questionnaire and an accompanying letter.  Tr. 511-513.  Malkoff opined that Haber had a poor ability to cope with stress, could not stay focused for long periods, did not retain enough information at times, and had reported issues with her short-term memory.  Tr. 511-512.  She wrote that Haber experienced cognitive confusion and often took days to formulate realistic solutions to her problems, which "would greatly interfere with her ability to work."  Tr. 513.

On October 22, 2017, Haber saw Dr. Finley-Belgrad and reported doing well with counseling and with Prozac.  Tr. 556-557.  Her mental exam status was normal.  Tr. 556.  She continued to report significant stressors at home.  Tr. 557.  Dr. Finley-Belgard wrote that she had discussed with Malkoff Haber's disability application and stated, "really feel she is doing better than that but happy to support her application."  Tr. 557.  She diagnosed moderate major depression.  Tr. 557.  In November she told Dr. Finley-Belgrad that the last week she was feeling better in general and problems with her parents continued.  Tr. 559-560.  Her mental status exam remained unremarkable and Dr. Finley-Belgrad discussing increasing her Prozac.  Tr. 559-560.

In January 2018, Haber saw Dr. Finley-Belgrad; her exam findings were as her prior visits except that she had mild inattention to her grooming.  Tr. 561.  Haber stated that her moods were up and down and she had significant stress at home with her parents.  Tr. 562.  Things were going well with her counselor, she had met two friends, and she had made progress clearing her room and working on personal hygiene.  Tr. 562.  She reported feeling better after making some dietary changes and that her medications were working well.  Tr. 562.

In February 2018, Haber saw Dr. Finley-Belgrad and her exam findings were unremarkable: she was adequately groomed; had normal motor activity; was alert, comprehended what was asked of her,

6

and gave relevant responses to questions; her speech, thought process, and mood were normal; her affect was stable and her judgment and insight were good.  Tr. 532.  She reported "doing better, more able to stay happy when things at home get tough."  Tr. 564.  She felt like she had some issues with concentration.  Tr. 565.  In March, her exam findings remained the same and she was doing much better with hygiene and had more enjoyment.  Tr. 566.  She was working hard on her attention issues and "things with that are ok."  Tr. 566.  In April things were going well despite a lot of stress with her relationship with her parents; she had returned to seeing her therapist and her exam findings were the same as her prior visit.  Tr. 581.  Her Prozac had been increased.  Tr. 581.  In June her exam findings remained the same, and she reported gradual improvement from January: she was better, was planning to move out of her parents' home at the end of the summer, had been doing a lot of cleaning and was almost done, was eating better and exercising, and following a schedule.  Tr. 579-580.  She still had poor eye contact and wanted to look for a job once she moved out of her parents' home.  Tr. 580.

On September 5, 2018, Malkoff reported that Haber's father had emailed her, describing behavior that Malkoff considered "functioning at a minimal level."  Tr. 588.  Malkoff arranged a psychiatric assessment with Dr. Andrew Hunt.  Tr. 588.  On September 7, Haber saw Dr. Hunt.  Tr. 644.  She endorsed depressed/irritable mood, diminished interest, change in appetite, recent weight gain, insomnia, fatigue, feeling worthless, guilt, poor concentration, inability to make decisions, suicidal ideations, worry, disordered eating, PTSD, and conduct issues.  Tr. 635.  Upon exam, she was well-groomed and had average demeanor, eye contact, and motor activity.  Tr. 646.  Her mood was anxious and depressed, her affect was full, and she was alert and oriented.  Tr. 646.  She was cooperative, language use was normal, and she had intact fund of knowledge and logical, goal-directed thought processing.  Tr. 646.  Dr. Hunt diagnosed ADHD; major depressive disorder, recurrent, severe; PTSD; and sensory integration disorder.  Tr. 646.  Dr. Hunt concluded that Haber "had serious executive

7

function issues" and "likely meets criteria for somatization disorder."  Tr. 646.

On October 19, 2018, Haber saw Dr. Finley-Belgrad and had unremarkable mental status exam findings.  Tr. 576.  She reported stressful interactions with her parents and difficulty keeping a schedule.  Tr. 577.  She felt things were "stable."  Tr. 577.  Dr. Finley-Belgrad diagnosed major depressive disorder, single episode, in partial remission and referred Haber to neuropsych testing for issues with memory, attention and understanding and encouraged family counseling.  Tr. 577.

On January 4, 2019, Haber transferred care from Dr. Finley-Belgrad and saw Melinda Smith, DNP, ACNSBA, for treatment of her psychiatric condition.  Tr. 614.  Upon exam, she was casually dressed with appropriate hygiene and adequate grooming, she had a moderately depressed and mildly anxious mood with a consistent affect, and cooperative, appropriate behavior.  Tr. 615.  She had poor eye contact, normal speech and thoughts with no symptoms or signs of psychosis, she was alert and oriented, her attention was mildly impaired, she had fair insight and judgment, normal memory and fund of knowledge, and her intelligence was in the average range.  Tr. 615.  Smith assessed moderate depression and mild anxiety, increased her Prozac, and started trazodone.  Tr. 616.

On February 1, 2019, Haber returned to Smith reporting that her increased Prozac was working well and that she had stopped trazodone as it was not helping her sleep.  Tr. 612.  She declined additional sleep aid medication.  Tr. 612.  Upon exam, her depression and anxiety were noted as "improving" and the balance of her findings were the same as her prior visit.  Tr. 612.  On February 12 she had a well visit and denied depression, anxiety, and sleep disturbances.  Tr. 619, 621.  Upon exam, she had a normal mood and affect, good judgment and insight, and normal recent and remote memory.  Tr. 621.  On February 26, Haber had an appointment with another medical provider and had normal mood and affect upon exam.  Tr. 626.

On March 27, 2019, Haber returned to Dr. Hunt reporting feeling down and procrastinating.  Tr.

638.  Her mental status exam findings were unchanged from her prior visit.  Tr. 640.  Dr. Hunt

continued her Prozac and noted that they could consider increasing it.  Tr. 640.  On May 7, Haber told

Dr. Hunt that she was doing more and getting out more and she was getting along better with her

parents.  Tr. 635.  Her medications were helping more.  Tr. 635.  She had taken a bath, which she

doesn't like to do because of her sensory condition, but she felt good about it.  Tr. 635.  Her mental

status exam finding were unchanged.  Tr. 636-637.

On June 4, 2019, Dr. Hunt completed a medical source statement and indicated that he last saw

Haber on May 7.  Tr. 650.  He stated that she had all the symptoms the form listed: depressed mood,

diminished interest in almost all activities, appetite and sleep disturbance, observable psychomotor

agitation or retardation, decreased energy, feelings of guilt or worthlessness, difficulty concentrating or

thinking, and thoughts of death or suicide.  Tr. 650.  He opined that Haber had a mild impairment in

understanding, remembering, and applying information; a marked impairment in concentrating,

persisting, and maintaining pace and adapting or management herself; and an extreme limitation

interacting with others.  Tr. 650.  She had a diminished capacity to adapt to changes in her environment.

Tr. 650.  She would be off-task at least 20% of an 8-hour workday due to anxiety severely impairing

executive functioning and poor concentration from anxiety and depression and she would be absent

about 4 times a month.  Tr. 651.

On June 25, 2019, Haber had a medical appointment and, upon exam, had a normal mood,

affect, and thought process.  Tr. 697.

On March 4, 2020, Haber saw Heather Dawson, APRN-CNP, whom she sought out on her own

for a psychiatric evaluation.  Tr. 687.  She was still taking Prozac, which was helpful, but she saw room

for more improvement.  Tr. 687.  She reported having some bad times and feeling down and depressed.

Tr. 687.  She had a boyfriend she had been dating for about two months.  Tr. 689.  Upon exam, she

9

appeared disheveled, avoided eye contact, had a depressed and anxious mood, a constricted affect, and over-productive speech.  Tr. 688-689.  She was described as having blocked poverty of thought content and slowed thinking as well as preoccupations and ruminations.  Tr. 689.  Her concentration and attention were noted as impaired, she had partial insight and mildly impaired judgment, and she had borderline intelligence.  Tr. 689.  Dawson increased Haber's Prozac and added Buspar for anxiety.  Tr. 692.

On March 10, 2020, Haber had a counseling assessment with Kristine Carchedi, LPCC-S, MSEd. Tr. 716-733.  Upon exam, she was oriented, had fair eye contact, a sad, apathetic, depressed and anxious mood, soft speech, was cooperative with adequate grooming and appropriate dress, had coordinated motor activity, fair memory, poor insight and judgment, average intelligent, and logical thought content. Tr. 727-728.  She denied past or present suicidal ideation.  Tr. 729.  She was assessed with moderate depressive disorder and generalized anxiety disorder.  Tr. 731.

On April 1, 2020, Haber had a telemed appointment with Dawson and stated that her mood was all over the place, although her anxiety had improved.  Tr. 683.  Upon limited exam, she was oriented with sufficient language and fund of knowledge, normal speech, and abnormal memory or thoughts.  Tr. 684.  Dawson continued her Prozac and started Rexulti.  Tr. 684.  The same day she had a counseling appointment with Carchedi and, upon exam, she was cooperative and had a flat and depressed affect and an anxious and depressed mood.  Tr. 758.  Her insight and judgment were impaired.  Tr. 758.

On April 15, 2020, Haber had a telemed visit with Dawson and said that she was fighting her anxiety and able to do more.  Tr. 679, 680.  She had been "ok" since her prior visit and had been cleaning her room although she had not bathed due to being focused on cleaning her room.  Tr. 679. Upon exam, she had poor insight, judgment, and attention span.  Tr. 680.  Her thought process was circumstantial with extra, unneeded details, she was fully oriented, and she had no agitation or

10

compulsive behavior.  Tr. 680.  She had sufficient fund of knowledge and no increased activity, memory loss, or mood swings.  Tr. 680.  Dawson increased her Rexulti.  Tr. 681.  On April 29, Haber told Dawson that she was doing better; she had stopped taking Rexulti because it made her restless and she could not sleep; now she was sleeping and her symptoms were better since she maintained a schedule.  Tr. 675.  Her exam findings were as her prior visit except that her thought process was linear.  Tr. 676.

On May 27, 2020, Haber told Dawson that her depression was worse and she experienced situational anxiety; she was not getting out of the house or taking care of herself.  Tr. 671.  Dawson increased her Prozac, adjusted other medications, and referred her to psychological testing.  Tr. 672.  On June 23, she reported that her functioning was "somewhat difficult" but she was doing a little bit better; she was not sure if it was the medication adjustment or being a little bit better about keeping a schedule.  Tr. 663.  On average, her sleep was better, although she had had poor sleep the night before.  Tr. 663.  The same day she had a telemed counseling appointment with Carchedi and reported continued poor self-care (she had taken one bath) and not having left the house much since her last appointment (she had been isolating in the basement).  Tr. 743.  Upon exam, she was cooperative, had a flat and blunted affect with an anxious, depressed, and stressed mood, and limited insight and impaired judgment.  Tr. 743.  Carchedi worked with her to develop a daily schedule to help her manage her symptoms.  Tr. 744.

On June 8, 2020, Haber had a "psychological evaluation for diagnostic clarification" with Carla Arlien, Ph.D., upon Dawson's referral.  Tr. 710.  Haber reported feeling depressed, anxious and socially awkward and endorsed short-term memory problems and concentration difficulties.  Tr. 710.  She stated that she had been diagnosed with sensory processing disorder in school and that her providers had diagnosed ADHD, depression, anxiety, avoidant personality disorder, and dependent personality disorder.  Tr. 710.  She was taking Prozac, 60mg.  Tr. 711.  Upon exam, she was well-groomed, had appropriate behavior, and was cooperative and fully oriented.  Tr. 712.  Her mood was depressed and

11

anxious, her affect was appropriate, her thoughts were logical, and her speech was soft.  Tr. 712.  She

had a mildly impaired short-term memory, intact long-term memory, and an accurate fund of knowledge

with good insight and judgment.  Tr. 712.  Dr. Arlien diagnosed major depressive disorder, recurrent,

severe, without psychotic features; generalized anxiety disorder; and rule out ADHD, personality

disorder, and Asperger's syndrome.  Tr. 712.  Dr. Arlien sent authorization in for further testing.  Tr.

713.

On July 13, 2020, Haber had a telemed appointment with Dawson and reported that she was on a

bad schedule/routine again, which "really disrupts her mood" and there was a lot of negativity in her

house.  Tr. 659.  She was still isolating but trying to get out more.  Tr. 659.  Upon exam, she was

anxious, had mood swings, poor insight, judgment, attention span, and concentration, and was noted to

be in denial.  Tr. 660.  She was fully oriented with appropriate behavior and sufficient fund of

knowledge and language.  Tr. 660.  Dawson adjusted her medications.  Tr. 661.  On July 29 she had a

telemed appointment with Carchedi and complained of some conflicts with her parents and friend but

that she was "ok" and "the same old same old."  Tr. 740.  Carchedi noted that, despite saying she was

"ok," Haber had "fallen off her daily routine and has been struggling to maintain a consistent schedule."

Tr. 740.  Her exam findings were the same as her prior visit.  Tr. 740.

On August 3, 2020, Haber had a telemed visit with Dawson and reported that her routine had

been "pretty good."  Tr. 704.  She reported problems sleeping, sleep medication side effects, and having

had a panic attack.  Tr. 704.  Her mental status examination was similar to her last visit except that her

concentration was disjointed.  Tr. 705.  She was still waiting to hear back from Dr. Arlien's office.  Tr.

705.  On August 10 she had a telemed visit with Carchedi and reported going out more—she had met a

friend for lunch and gone shopping with her dad.  Tr. 738.  Her sleep had improved and she had been

more attentive to her daily self-care.  Tr. 738.  Her exam findings were the same as her prior visit.  Tr.

738. On August 25 she reported to Dawson that her schedule and sleep had been bad. Tr. 699. Her exam findings were as her prior visit except that her concentration was described as "slow response." Tr. 700. Dawson gave her a schedule: walk once a day, shower three times a week, find something to do during the day, and no naps. Tr. 700.

On September 8, 2020, Haber did not answer Carchedi's telemed appointment call and the appointment was canceled. Tr. 737.

## C.    State Agency Reports

On October 18, 2017, Aracelis Riveria, Psy.D., reviewed Haber's record and, regarding her RFC assessment, found that Haber could perform routine work in an environment without fast pace and/or high production quotas, could interact with others on an occasional, superficial basis, and can respond appropriately to changes in the work setting that are foreseen and/or gradually implemented. Tr. 109-112, 124-125. On January 24, 2018, Vicki Warren, Ph.D., agreed with Dr. Riveria's opinion. Tr. 138-140, 150-152.

## D.    Hearing Testimony

During the May 3, 2019 hearing, Haber testified to the following:

- She lives with her parents. Tr. 81. She does not drive; if she needs to go somewhere her dad drives her. Tr. 81-82. She graduated from high school with average grades; half her classes were IEP classes and half were normal. Tr. 82. She tried going to college after high school, but due to her anxiety and depression she was missing classes and not able to complete homework. Tr. 82. About 1 ½ years later she tried again, staying with her dad's friend and taking online classes, but she receded into a dark and depressive state and went back home. Tr. 82-83.

- When asked what prevented her from working, she stated that she had been diagnosed with depression, anxiety, sensory integration, ADHD, and personality disorders. Tr. 83. She had anxiety around people and could not keep a normal schedule or do normal activities. Tr. 83. Sometimes she gets so anxious that she loses the sense of reality around herself and gets lost in fear and dark thoughts. Tr. 83. She loses contact with reality and it takes anywhere from an hour or a couple days to calm down. Tr. 83-84.

13

- She takes an anti-depressant and has counseling sessions.  Tr. 85.  She has gotten a lot of advice over the years to manage her symptoms.  Tr. 85.  She has problems sleeping.  Tr. 85-86.  She has finally gotten to a point where she feels she can be around people and talk to them.  Tr. 86.  She tries hard to stay on a schedule; there are times that she does that well and times that she does that poorly.  Tr. 86.  She takes her medication without reminders from her parents but there are times when she has no schedule; everything is reversed or backwards.  Tr. 86.  There have been times that she has messed up taking her medicine.  Tr. 86.  She has had times in which she has gone through crying spells for weeks, has been very depressed, and lacks motivation.  Tr. 87.

- When asked to describe a typical day, she stated that she wakes up at different times because she has no schedule.  Tr. 87.  When she wakes up she takes her medication, eats breakfast, and, if she is having a good day, cleans her room for some time.  Tr. 87.  Over the past few months she has been spending more time with her family; some of that is good and some is stressful.  Tr. 87.  Then she feels exhausted and, though she tries to fight it, she ends up taking a nap.  Tr. 87-88.  When she gets up, on a bad day not much will happen.  Tr. 88.  On a good day she will clean her room some more; she's always struggled with neatness and keeping things in order.  Tr. 88.  She'll get exhausted again, sometimes feel sad over a small thing, and lie down for awhile; on a bad day she'll sleep too long and will not be able to keep a good schedule.  Tr. 88.  If her parents are watching TV, sometimes she'll join them, and she uses a computer but is not on social media.  Tr. 88.  She reads from time to time.  Tr. 88.  She tries to motivate herself and push herself to do things that day or the next day; for months she has been trying to get out of the house and visit friends.  Tr. 88.  She has not succeeded yet; the hearing is the first time she had been out of the house for months other than to attend doctor appointments.  Tr. 88.  There is no friend or other family member she sees on a regular basis.  Tr. 89.

- She struggles with her personal care; she does not keep a personal hygiene schedule.  Tr. 90.  At times she goes months without showering.  Tr. 90.  An example of her inability to concentrate is when she is cleaning her room; she loses focus, finds herself staring at the floor, and then she experiences a lack of motivation.  Tr. 91.  That has been happening since she was a child.  Tr. 91.  The weather affects her sensory integration problem; when it is hot she gets very uncomfortable and certain clothing makes her very uncomfortable.  Tr. 91.  That problem has gotten worse as she's gotten older.  Tr. 91.  Noise and crowded environments also affect her.  Tr. 92.  When that happens, she sits there quietly and avoids making eye contact.  Tr. 92.  She will have an urgency to leave.  Tr. 92.  Sometimes the fabric on the chair or her clothes bothers her and she feels overwhelmed and wants to get away.  Tr. 92.

- One summer she worked directing parking cars in someone's yard for the Canfield fair, but she had problems because it was hot, she was embarrassed and anxious around people, she didn't feel confident telling people where they were supposed to park, and she felt like she was giving them wrong advice.  Tr. 94.  She also worked at a fireworks store one summer as a bagger; that job was difficult because she was required to wear jeans and she was uncomfortable.  Tr. 94.  She struggled to interact with all the people in line and would lose confidence.  Tr. 94.

14

At the September 16, 2020, hearing, Haber testified to the following:

- She lives in a house with her parents and does not drive.  Tr. 53.  When asked why she didn't drive, she stated that she was behind on a lot of things in life and that she was fearful.  Tr. 53.  If she needs to go somewhere her dad drives her.  Tr. 54.

- She had problems with math in school, but she can do a simple math problems and make change for a $20 bill.  Tr. 54.  She reads and is able to write.  Tr. 54.

- She has worked three jobs in the past; they were are seasonal, summer jobs.  Tr. 55.  When asked why she is unable to work, she cited her diagnoses and stated that she's very down now in life and it's hard to do things that others consider easy.  Tr. 55.  She is on medication and sees a cognitive therapist.  Tr. 55.  She takes Prozac, a mood stabilizer, and some other medications.  Tr. 55.  Her medications help with her depression and daily anxiety and she experienced no side effects from them at this time.  Tr. 55-56.  She has crying spells, mood swings, and panic attacks—she gets a racing heart, quick breath, gets fidgety, has racing thoughts, and everything feels impossible.  Tr. 56-57.  She has learned tools in therapy, which she has continued to use.  Tr. 58.

- Her parents will give her some chores to do around the house, like helping with the pets and cleaning, which she can do for about 20 minutes.  Tr. 58-59.  She enjoys talking to friends over the phone (20 minutes to an hour, a couple of times a week in a good week) journaling (10 minutes), and spending time with her pets.  Tr. 59-61.  Pre-covid she would sometimes see a friend in person.  Tr. 59.  She has about 3 or 4 friends she talks to on a regular basis and when she feels sad she will not talk to them for a couple of days or a week.  Tr. 62.

- When she had to wear jeans for her summer job it distracted her because the whole time it was on her mind and she just wanted to get done with work so she could not wear them anymore.  Tr. 63.  When asked about college, she stated that she was depressed but didn't realize it, all her depression came out with her social anxiety, and she came home about half-way through her first semester.  Tr. 63.  She lived on campus without a roommate.  Tr. 64.

- She still has problems sleeping.  Tr. 64.  She struggles to take care of herself, like showering and eating right.  Tr. 65.  With respect to bathing, sometimes she doesn't realize that she needs to.  Tr. 65.  During good spells she bathes 1-3 times a week; during bad spells "maybe a handful of times a month, if that."  Tr. 65.

The ALJ asked the VE whether a hypothetical individual with the same age, education and vocational background as Haber could perform work if the individual had the limitations assessed in the ALJ's RFC determination, described below.  Tr. 67-68.  The VE answered that such an individual could perform the following representative jobs in the economy: hand packager, dishwasher, and sweeper/cleaner.  Tr. 68-69.   The ALJ asked what the permitted off-task time and absenteeism rate was

15

for unskilled work and the VE stated that an individual off-task 13% or more of the day or absent three times would not be able to stay employed. Tr. 70-71.

### III. STANDARD FOR DISABILITY

An individual under the age of eighteen is considered disabled if she "has a medically determinable physical or mental impairment, which results in marked and severe functional limitations, and which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 1382c(a)(3)(C)(i). A claimant may also be entitled to child's disability benefits if she is at least 18 years old and has a disability that began before she turned 22 years old. 42 U.S.C. § 402(d)(1)(B)(ii). And a disabled claimant may be entitled to receive SSI benefits. 20 C.F.R. § 416.905; *Kirk v. Sec'y of Health & Human Servs*., 667 F.2d 524 (6th Cir. 1981). To receive SSI benefits, a claimant must meet certain income and resource limitations. 20 C.F.R. §§ 416.1100, 416.1201.

The Commissioner reaches a determination as to whether an individual under the age of 18 is disabled by establishing whether a claimant has a severe medically determinable impairment and, if so, whether the claimant has an impairment or combination of impairments that meets, medically equals, or functionally equals the listings. 20 C.F.R. § 416.924. In determining whether an impairment or combination of impairments functionally equals the listings, the ALJ assesses the claimant's functioning in terms of six domains: (1) acquiring and using information; (2) attending and completing tasks; (3) interacting and relating with others; (4) moving about and manipulating objects; (5) caring for self; and (6) health and physical well-being. 20 C.F.R. § 416.926a(b)(1). To functionally equal the listings, the claimant's impairment must result in "marked" limitations in two domains or an "extreme" limitation in one domain. 20 C.F.R. § 416.926a(d).

The Commissioner reaches a determination as to whether an adult claimant is disabled by way of a five-stage process. 20 C.F.R. §§ 404.1520(a)(4) *and* 416.920(a)(4). *See also Ealy v. Comm'r of Soc. Sec*.,

16

594 F.3d 504, 512 (6th Cir. 2010); *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990). First, the claimant must demonstrate that she is not currently engaged in "substantial gainful activity" at the time of the disability application. 20 C.F.R. §§ 404.1520(b) *and* 416.920(b). Second, the claimant must show that she suffers from a "severe impairment" in order to warrant a finding of disability. 20 C.F.R. §§ 404.1520(c) *and* 416.920(c). A "severe impairment" is one that "significantly limits . . . physical or mental ability to do basic work activities." *Abbot*, 905 F.2d at 923. Third, if the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment, or combination of impairments, meets or medically equals a required listing under 20 CFR Part 404, Subpart P, Appendix 1, the claimant is presumed to be disabled regardless of age, education or work experience. *See* 20 C.F.R. §§ 404.1520(d) *and* 416.920(d). Fourth, if the claimant's impairment or combination of impairments does not prevent her from doing her past relevant work, the claimant is not disabled. 20 C.F.R. §§ 404.1520(e)-(f) *and* 416.920(e)-(f). For the fifth and final step, even if the claimant's impairment does prevent her from doing her past relevant work, if other work exists in the national economy that the claimant can perform, the claimant is not disabled. 20 C.F.R. §§ 404.1520(g), 404.1560(c), *and* 416.920(g).

### IV. SUMMARY OF COMMISSIONER'S DECISION

The ALJ made the following findings of fact and conclusions of law:

1. Born on December **, 1996, the claimant had not attained age 22 as of December **, 1996, the alleged onset date (20 CFR 404.102, 416.120(c)(4) and 404.350(a)(5)).

2. The claimant has not engaged in substantial gainful activity since December **, 1996, the alleged onset date (20 CFR 404.1571 *et seq*., and 416.971 *et seq*.).

3. Prior to attaining age 18, the claimant had the following severe impairments: affective disorder; attention deficit hyperactivity disorder (ADHD); somatization; posttraumatic stress disorder (PTSD); sensory processing and integration impairment; obsessive compulsive personality disorder (OCD); avoidant and dependent personality disorder; and adjustment disorder with anxiety (20 CFR 426.924(c)).

4.     Prior to attaining age 18, the claimant did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 416.924, 416.925 and 416.926).

5.     Prior to attaining age 18, the claimant did not have an impairment or combination of impairments that functionally equaled the severity of the listings (20 CFR 416.924(d) and 416.926a).

6.     Because the claimant did not have an impairment or combination of impairments that met, medically equaled any listing or functionally equaled the listings, the claimant was not disabled prior to attaining age 18 (20 CFR 416.924(a)).

7.     Since attaining age 18, the claimant has the following severe impairments: depressive disorder; mood disorder; adjustment disorder; anxiety disorder; avoidant personality disorder and dependent personality disorder; PTSD; sensory integration disorder; ADHD; and Asperger's syndrome (20 CFR 404.1520(c) and 416.920(c)).

8.     Since attaining age, 18, the claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

9.     After careful consideration of the entire record, the undersigned finds that, since attaining age 18, the claimant has the residual functional capacity to perform a full range of work at all exertional levels but with the following nonexertional limitations: can perform simple, routine and repetitive tasks, but cannot perform tasks at a production rate pace such as assembly line work, can make only simple work-related decision, and should not be responsible for the safety or welfare of others; can interact on an occasional basis with supervisors and a small group of familiar coworkers, with no more than incidental interaction with the general public, and should be limited to superficial contact meaning no sales, arbitration, negotiation, conflict resolution or confrontation, no group, tandem or collaborative tasks, no management, direction or persuasion of others; and can respond appropriately to occasional change in a routine work setting, as long as any such changes are explained and/or demonstrated prior to gradual implementation.

10.    The claimant has no past relevant work (20 CFR 404.1565 and 416.965).

11.    The claimant was born on December **, 1996 and attained age 18 on 12/**/2014. She was a younger individual age 18-49, on the date of attainment of age 18 (20 CFR 404.1563 and 416.963).

12.    The claimant has at least a high school education (20 CFR 404.1564 and 416.964).

13.    Transferability of job skills is not an issue because the claimant does not have past relevant work (20 CFR 404.1568 and 416.968).

14.  Since the date the claimant attained age 18, considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569, 404.1569a, 416.969, and 416.969a).

15.  The claimant has not been under a disability, as defined in the Social Security Act, from December **, 1996, through the date of this decision (20 CFR 404.350(a)(5), 404.1520(g), 416.906, and 416.924(a) and (c)).

Tr. 21-34.

## V. STANDARD OF REVIEW

"The Social Security Act authorizes narrow judicial review of the final decision of the Social Security Administration (SSA)." *Reynolds v. Comm'r of Soc. Sec.*, 2011 WL 1228165 at * 2 (6th Cir. April 1, 2011).  Specifically, this Court's review is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards. *See Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010); *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009).  Substantial evidence has been defined as "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of Health and Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)).  In determining whether an ALJ's findings are supported by substantial evidence, the Court does not review the evidence *de novo*, make credibility determinations, or weigh the evidence. *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).

Review of the Commissioner's decision must be based on the record as a whole. *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001).  The findings of the Commissioner are not subject to reversal, however, merely because there exists in the record substantial evidence to support a different conclusion. *Buxton v. Halter*, 246 F.3d 762, 772-3 (6th Cir.2001) (citing *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986)); *see also Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 389-90 (6th Cir. 1999)

("Even if the evidence could also support another conclusion, the decision of the Administrative Law Judge must stand if the evidence could reasonably support the conclusion reached.").  This is so because there is a "zone of choice" within which the Commissioner can act, without the fear of court interference. *Mullen*, 800 F.2d at 545 (citing *Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984)).

In addition to considering whether the Commissioner's decision was supported by substantial evidence, the Court must determine whether proper legal standards were applied.  Failure of the Commissioner to apply the correct legal standards as promulgated by the regulations is grounds for reversal.  *See, e.g., White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009); *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("Even if supported by substantial evidence, however, a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.").

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result."  *Fleischer v. Astrue*, 774 F.Supp.2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Chater,* 78 F.3d 305, 307 (7th Cir.1996)); *accord Shrader v. Astrue*, 2012 WL 5383120 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the Court cannot determine if it was discounted or merely overlooked."); *McHugh v. Astrue*, 2011 WL 6130824 (S.D. Ohio Nov. 15, 2011); *Gilliam v. Astrue*, 2010 WL 2837260 (E.D. Tenn. July 19, 2010); *Hook v. Astrue*, 2010 WL 2929562 (N.D.Ohio July 9, 2010).

## VI. ANALYSIS

### A. Haber's constitutional challenge fails

Andrew Saul became Commissioner of the Social Security Administration on June 17, 2019,

pursuant to 42 U.S.C. § 902(a).[3]  Section 902(a)(3) provides, "An individual serving in the office of Commissioner may be removed from office only pursuant to a finding by the President of neglect of duty or malfeasance in office."  *Id*.  The parties agree that that portion of § 902(a)(3) violates the separation of powers because it limits the President's authority to remove the Commissioner without cause.  Doc. No. 10, p. 9; Doc. No. 13, p. 11; *see also Seila Law LLC v. Consumer Financial Protection Bureau*, -- U.S. --, 140 S. Ct. 2183, 2197 (2020) (statutory restriction on the President's ability to remove the head of an agency ("for inefficiency, neglect, or malfeasance") violates the separation of powers and is unconstitutional); *Collins v. Yellen*, -- U.S. --, 141 S. Ct. 1761, 1787-89 (2021) (statutory restriction on the President's ability to remove the head of an agency (e.g., "for cause," "neglect of duty, or malfeasance in office") violates the separation of powers and is unconstitutional).

The parties disagree as to what effect that unconstitutional removal restriction has on the ALJ's determination of Haber's disability application.  Haber argues that she is entitled to remand for a new hearing and decision.  Defendant disagrees, asserting that Haber must show that the unconstitutional removal restriction caused the denial of her benefits claim and that she does not make such a showing.

In *Seila Law*, the Court found that the unconstitutional removal provision was severable from the other provisions of the relevant statute but did not discuss what a plaintiff must show to obtain relief when challenging actions taken by the head of an agency who derived powers from a statute that included an unconstitutional removal provision.  140 S. Ct. at 2208, 2211.  In *Collins*, the Court took up that discussion and provided guidance regarding the kind of compensable harm a plaintiff must show to be entitled to relief.  141 S.Ct. at 1787-1789.

### 1. *Collins v. Yellen*

*Collins* involved the Federal Housing Finance Agency ("FHFA"), an agency created by

---

[3]  https://www.ssa.gov/history/saul.html.  Saul is no longer the Commissioner.

Congress tasked with regulating Fannie Mae and Freddie Mac, two of the country's leading sources of mortgage financing. 141 S.Ct. at 1770. Pursuant to the statute creating the FHFA, the head of the agency was a Director removable by the President "only 'for cause.'" *Id*. Fannie Mae and Freddie Mac shareholders challenged an agreement the FHFA had made with the United States Treasury (the "third amendment"), which channeled money from Fannie Mae and Freddie Mac to the Treasury rather than shareholders. *Id*. They argued that the removal provision in the FHFA statute was unconstitutional because, by restricting the President's power to remove the FHFA Director, the statute the violated separation of powers. *Id*. at 1787. The Court agreed. *Id*. (citing *Seila Law*, 140 S. Ct. at 2205). But the Court did not provide the shareholders the remedy that they sought—that "the third amendment must be completely undone"—for the following reasons.

First, the shareholders had sought to undo the third amendment because it was "adopted and implemented by officers who lacked constitutional authority and that their actions were therefore void *ab initio*." *Id*. But the Court noted that the third amendment was adopted by the FHFA's Acting Director, whose position did not have the improper removal restriction that the Director's position had had, so the shareholders' attempt to set aside the third amendment "in its entirety" failed. *Id*. at 1783, 1787. Next, regarding the shareholders' argument with respect to the actions that Directors had taken to implement the third amendment, the Court reasoned,

> All the officers who headed the FHFA during the time in question were properly *appointed*. Although the statute unconstitutionally limited the President's authority to *remove* the confirmed Directors, there was no constitutional defect in the statutorily prescribed method of appointment to that office. As a result, there is no reason to regard any of the actions taken by the FHFA in relation to the third amendment as void.

*Id*. at 1787 (emphasis in original).

The Court went on to explain that an unconstitutional provision like the removal restriction could inflict compensable harm, and gave the following examples:

Suppose, for example, that the President had attempted to remove a Director but was prevented from doing so by a lower court decision holding that he did not have "cause" for removal. Or suppose that the President had made a public statement expressing displeasure with actions taken by a Director and had asserted that he would remove the Director if the statute did not stand in the way. In those situations, the statutory provision would clearly cause harm.

*Id.* at 1789.  The Court remanded the case for consideration of the shareholder's suggestion that "the President might have replaced one of the confirmed Directors who supervised the implementation of the third amendment, or a confirmed Director might have altered his behavior in a way that would have benefited the shareholder."  *Id.* at 1789.

### 2. Haber does not show compensable harm and is not entitled to a remand

Haber argues that the government deprived her of a "valid administrative process" because the ALJ who decided her case was "delegated" authority by then-Commissioner Saul, "which means that [the ALJ's] ability to make findings of fact and issue a final decision was constitutionally defective." Doc. No. 10, p. 9; Doc. No. 14, p. 3.[4]  But the argument that Saul had no authority to carry out the functions of his office because the removal restriction was unconstitutional was rejected by the Court in *Collins*.  141 S.Ct. at 1788, n.23 ("[T]he unlawfulness of the removal provision does not strip the Director of the power to undertake the other responsibilities of his office").  Because Saul had the authority to carry out the functions of his office, the ALJ who decided Haber's case while Saul was Commissioner cannot have issued a *per se* unconstitutional decision just because authority had been "delegated" to him by Saul.  *Id.*

Haber contends, "The ALJ in this matter decided this case based on regulations promulgated by the Commissioner when he had no authority to issue the same….This means that a presumptively inaccurate legal standard was utilized by both the ALJ and the Appeals Council to adjudicate this

---

[4] Defendant asserts, and Haber does not dispute, that the ALJ who decided her case was not appointed by Saul, but by Saul's predecessor, then-Acting Commissioner Berryhill.  Doc. No. 13, p. 13; Doc. No. 14, p. 5.  Berryhill's appointment as Acting Commissioner was not made pursuant to § 902(a)(3); did not contain a "for cause" removal provision; and, thus, was not unconstitutional.  *See Collins*, 141 S.Ct. at 1782.

claim[.]"  Doc. No. 10, p. 9.  Her argument fails because, as stated above, the unconstitutional removal provision did not strip Saul of his authority to fulfill his obligations of office, including promulgating regulations.  Moreover, she does not identify what regulations Saul promulgated that the ALJ used to decide her case.  In short, she has not shown compensable harm of the type described by the Court in *Collins*.

In her reply brief, Haber argues that the Social Security Commissioner could only be removed for neglect of duty or malfeasance of office, which is a higher standard for removal than the statutes at issue in *Seila Law* and *Collins*.  Doc. No. 14, p. 3 (citing 42 U.S.C. § 902(a)(3)).  Thus, Haber claims, "the issue in this matter was even more unconstitutional."  Doc. No. 14, p. 3.  But she cites no legal authority indicating that the compensable harm requirement in *Collins* is meant to be applied on a sliding scale depending on the removal language in the relevant statute.  She argues that while Saul was Commissioner "he implemented changes in HALLEX which modified the way in which decisions were written (I-2-3-20 in effect July 17, 2019)" and in DI 34121.013 and DI 34121.015, which modified the way musculoskeletal impairments are evaluated.  Doc. No. 14, p. 4.  But HALLEX 1-2-3-20, "Acknowledgment of Notice of Hearing," sets forth ways in which the Agency communicates to claimants that it received their notice of hearing forms; it does not modify the way the ALJs write their decisions.[5]  Haber does not claim that she suffered any harm as a result of her request for a hearing and his receipt of the Agency's notice scheduling one.  And POMS DI 34121.013 and 34121.015 became effective in April 2021 and did not impact Haber's 2017 application or 2020 hearing and decision.[6]  Moreover, Haber has not alleged a musculoskeletal impairment.

Finally, Haber complains that Defendant downplayed the effect the Commissioner has on the

---

[5]  *See* https://www.ssa.gov/OP_Home/hallex/I-02/I-2-3-20.html (last visited 4/6/22).  Haber does not provide a link to the Hallex provision that she states came into effect in July 2019.

[6]  *See* https://secure.ssa.gov/poms.nsf/lnx/0434121013; https://secure.ssa.gov/poms.nsf/lnx/0434121015 (last visited 4/6/22).

disability adjudication process, an effect "publicly stated by President Biden and the White House when the President finally terminated Mr. Saul as Commissioner." Doc. No. 14, pp. 5-6. Haber does not identify the public remark made by the President, the date it was made, the date Saul was removed as Commissioner, or explain how her disability application was impacted as a result. Thus, she has not shown the type of compensable harm stemming from the unconstitutional removal provision that was described in *Collins*. The undersigned find that Haber's constitutional challenge fails.

**B. The ALJ's determination of Haber's application for child's benefits is supported by substantial evidence**

Haber argues that the ALJ erred when evaluating her application for child's benefits. Doc. No. 10, p. 11. She complains that the ALJ found that she did not have any marked limitations in any of the functional domains prior to age 18 but failed to provide any evidentiary support or rationale for his findings. Doc. No. 10, p. 11 (citing Tr. 23-28).

While true that the ALJ did not cite evidence when finding that Haber had no limitations in the areas acquiring and using information, moving about and manipulating objects, or health and physical well-being, Haber does not show that there was any evidence for the ALJ to cite. Indeed, Haber does not cite evidence indicating that she had limitations in those areas either. The ALJ listed examples of the kinds of limitations a claimant may have, which are detailed in the regulations, in all six areas of functioning. Tr. 23-28. Considering those examples, Haber does not cite evidence in the record that she had any problems "moving about and manipulating objects." She does not describe evidence showing that she had limitations in "health or physical well-being." And she does not identify evidence showing she had limitations in "acquiring and using information." She cites her IEP accommodations (Doc. No. 10, pp. 11-12) but does not tie those accommodations to the types of limitations detailed by the ALJ and the regulations that would show limitations in acquiring and using information. Moreover, the ALJ had explained that her WISC-IV testing had placed her in the average range, her school performance

25

improved with IEP accommodations and those accommodations were deemed effective for her needs, and she had received an A and a B in class that year and was described as "extremely creative and thrives during projects requiring creativity."  Tr. 23.  Thus, the undersigned finds that Haber has not shown that the ALJ erred when he did not cite evidence to support his finding that Haber had no limitations in the three areas of functioning discussed above.

Next, Haber argues that the ALJ failed to provide any evidentiary support or rationale for his findings when he concluded that she had less than marked limitations in the domains attending and completing tasks, interacting and relating with others, and caring for yourself.  Doc. No. 10, p. 11.  But the ALJ did cite evidence in support of his findings in those domains.  Tr. 25-27.  In attending and completing tasks, the ALJ wrote that Haber had a "less than marked limitation"; in support, he cited her IEP that permitted her to receive extended time on exams in an isolated area, "extra time for classwork, copies of teachers' notes, teacher reminders, etc. (1F/1, 3, 13, 54)."  Tr. 25.  He found that she was not always prompt in turning in work or making up missed assignments.  Tr. 25.  Haber argues that those school records are evidence of a "marked" limitation, but the ALJ disagreed, and Haber does not show that the ALJ's finding is error.  Given the examples of limitations the regulations list (cited by the ALJ (Tr. 24-25)), the undersigned finds that the ALJ's characterization of Haber's restrictions in this area as "less than marked" is reasonable and supported by substantial evidence.

So, too, with respect to the other areas of functioning challenged by Haber.  The ALJ found that Haber had a "less than marked limitation" in interacting and relating with others, explaining that she "interacted with others in school (received peer tutoring), but spent most of her time with family."  Tr. 26.  The ALJ explained that Haber had a "less than marked limitation" in the ability to care for herself and wrote, "[t]he claimant had severe mental impairments and did not receive proper care until she turned 18, but she took care of her personal and hygiene needs without assistance."  Tr. 27.  Given the

26

examples in the regulations cited by the ALJ of limitations in these areas (Tr. 25-27), the undersigned finds that the ALJ's characterization of Haber's restrictions in these areas as "less than marked" is reasonable and supported by substantial evidence.

In sum, the undersigned finds that substantial evidence supports the ALJ's decision denying her application for child's benefits from the day she was born to her eighteenth birthday.

## C. The ALJ's decision denying Haber's SSI application is not supported by substantial evidence

Haber argues that the ALJ's step three finding in her SSI application is not supported by substantial evidence. She challenges the ALJ's determination of "moderate" limitations in the four areas of functioning and contends that the evidence shows that she had a "marked" limitation in all four areas. Doc. No. 10, pp. 15-16. She complains that the ALJ did not consider all the relevant evidence in the record or provide sufficient information for the Court to review. Doc. No. 10, p. 17. In response, Defendant submits that the ALJ's findings are supported by substantial evidence. Doc. No. 13, pp. 23-24. After review, the undersigned finds that the ALJ's step three determination is not supported by substantial evidence.

At step three of the disability evaluation process, a claimant will be found disabled if her impairment(s) meets or equals one of the listings in the Listing of Impairments. 20 C.F.R. § 404.1520(a)(4)(iii). The claimant bears the burden of establishing that her condition meets or equals a listing. *Thacker v. Soc. Sec. Admin.*, 93 Fed. App'x 725, 727-728 (6th Cir. 2004) (citing *Buress v. Sec'y of Health & Human Servs.*, 835 F.2d 139, 140 (6th Cir. 1987)). Thus, a claimant "must present specific medical findings that satisfy the various tests listed in the description of the applicable impairment or present medical evidence which describes how the impairment has such equivalency." *Id.* at 728 (citing *Evans v. Sec'y of Health & Human Servs.*, 820 F.2d 161, 164 (6th Cir. 1987)). "Each listing specifies the objective medical and other findings needed to satisfy the criteria of that listing" and a claimant

27

"must satisfy all the criteria to meet the listing." *Reynolds v. Comm'r of Soc. Sec.*, 424 Fed. App'x 411, 414 (6th Cir. 2011) (internal quotation marks omitted).

Defendant argues that, with respect to concentration, persistence, and pace, the ALJ "reasonably outlined only moderate limitations, noting that it was tasks that were unappealing to Plaintiff that left her distracted and lead to procrastination." Doc. No. 13, p. 23; Tr. 29. But the ALJ did not explain what "tasks" he found were unappealing to Haber that caused her to procrastinate and it is not clear from the record what tasks the ALJ is referring to. With respect to interacting with others, Defendant argues that the ALJ found that Haber "recently[] found herself spending more time with her father and her friends." Doc. No. 13, p. 23; Tr. 29. But the ALJ does not address evidence from 2020 showing that Haber had spells where she would spend time with others but then would have spells where she would isolate. See, e.g., Tr. 744, 659, 671, 88.

Defendant asserts that, with respect to adapting and managing herself, the ALJ "again reasonably found only moderate limitations" when he explained that she "demonstrated the capacity to adapt and manage her symptoms, particularly on an effective medication regimen." Doc. No. 13, pp. 23-24; Tr. 29. But the ALJ cited no evidence for his conclusion that she can adapt and manage her symptoms or that medication was effective in that regard. There is evidence in the record showing that Haber's symptoms fluctuate and persist despite taking an increased dose of Prozac and that other medications did not provide permanent help or caused problematic side effects. See, e.g., Tr. 704, 659, 711. Thus, the undersigned finds that the ALJ's step three findings are not supported by substantial evidence.

Moreover, later in his decision, when detailing the evidence, the ALJ wrote,

[Haber's] 2020 treatment records indicated that she was fully oriented with no agitation or compulsive behavior. The claimant's affect was appropriate. She exhibited normal memory, good insight and good judgment, no pressured speech, obsessive thoughts, paranoia, or suicidal ideations (19F; 21F; 22F; 23F). In August 2020, the claimant showed noticeable improvement when she reported that she "has been leaving the house more often, e.g., shopping with dad and had lunch with a friend." She also reported improved sleep and more attention to daily self-care

28

(24F/2).

Tr. 31.  But the ALJ did not mention that Haber's treatment records in 2020 showed abnormal exam findings, including with respect to her affect, memory, insight and judgment.  See, e.g., Tr. 688-689 (appeared disheveled, avoided eye contact, depressed and anxious mood, constricted affect, over-productive speech, blocked poverty of thought content, slowed thinking, preoccupations and ruminations, impaired concentration and attention, partial insight, mildly impaired judgment); Tr. 727-728 (oriented, fair eye contact, sad, apathetic, depressed and anxious mood, soft speech, fair memory, poor insight and judgment); Tr. 684 (poor attention, concentration, insight and judgment, fleeting death ideation, slowed thought process, mood swings); Tr. 743 (flat and blunted affect, anxious, depressed, and stressed mood, limited insight and impaired judgment); Tr. 660 (mood swings, poor insight, judgment, attention span, and concentration, noted to be "in denial."); Tr. 705 (anxious, forgetful, poor insight and judgment, poor attention span and poor and disjointed concentration).  Thus, the record does not support the ALJ's statement that Haber's exam findings in 2020 were as benign as he characterized them.  He also did not account for the fact that she had spells in which she improved but did not sustain that improvement.  Thus, while Haber reported meeting a friend for lunch and going shopping with her dad on August 10, as the ALJ noted (Ex. 24F/2, Tr. 738), the ALJ did not note that on August 25 Haber reported that her schedule and her sleep had been bad and her depression and anxiety had worsened.  Tr. 699.  Thus, to the extent the ALJ believed that Haber's condition had improved on August 10, he does not explain how he arrived at that conclusion given the other evidence in the record.

Finally, the ALJ's errors described above impact his evaluation of the opinion evidence.  The ALJ found Malkoff's opinion to be not persuasive because her opinion "only mildly reflects the claimant's psychological treatment and is not consistent with the record that shows moderate limitations in adaptation, social interaction and in concentration, persistence and pace."  Tr. 33.  But the ALJ's

29

evaluation of Haber's functioning in those areas is not based on substantial evidence, as noted above, and it is not clear what the ALJ means when he says that Malkoff's opinion "only mildly reflects [Haber's] psychological treatment."  With respect to Dr. Hunt's opinion, the ALJ found it to be not persuasive in part because it is not consistent with the record as a whole, but the ALJ ignored evidence in the record, also described above.  And when evaluating the state agency reviewers' opinions, the ALJ wrote,

> [T]he State Agency concluded that the claimant has "difficulty with timeliness" [and] that "occasional timeliness" should be added to the assigned residual functional capacity, but the record does not support the claimant has difficulty in that regard, she completed her school work on-time mostly, and performs personal care in a timely manner. Lastly, she does not live according to her own schedule, i.e. is "in her own world."

Tr. 33.  To the extent Haber completed her schoolwork on time "mostly," she had an IEP accommodation in which the teacher would cue or remind her of homework assignments she needed to turn in.  Tr. 421, 433.  "Performs personal care in a timely manner" is not supported by the record; the record is replete with evidence showing that Haber reported not taking baths.  And the ALJ's last line is perplexing; Haber's issues with keeping a schedule factors heavily in her treatment notes and it is unclear what the ALJ means to convey with that statement.  On remand, the ALJ will have an opportunity to reevaluate the opinion evidence.

In sum, the undersigned finds that the ALJ's decision denying Haber's SSI application is not supported by substantial evidence and his decision should be reversed.

## VII. CONCLUSION

For the foregoing reasons, the Magistrate Judge recommends that the Commissioner's final

decision be VACATED and REMANDED for further proceedings consistent with this opinion.


Date: April 6, 2022                                   _s/ Jonathan Greenberg_
                                                      Jonathan D. Greenberg
                                                      United States Magistrate Judge




**<u>OBJECTIONS</u>**
**Any objections to this Report and Recommendation must be filed with the Clerk of Court within fourteen (14) days after the party objecting has been served with a copy of this Report and Recommendation. 28 U.S.C. § 636(b)(1).  Failure to file objections within the specified time may forfeit the right to appeal the District Court's order.  _See Berkshire v. Beauvais_, 928 F.3d 520, 530-531 (6th Cir. 2019).**